# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEON C. WHITE,<br><br>    Plaintiff,<br><br>v.<br><br>JAMES N. MATTIS, *et al.*,<br><br>    Defendants. | Civil Action No. 18-02867 (ESH) |

## MEMORANDUM OPINION

After serving in the Army for nine years, Plaintiff Leon C. White was found unfit to perform his duties as an Infantryman because of a lower back disability. After a medical examination, the military determined that his disability was not severe enough to qualify him for retirement, and he was separated with severance pay. White appealed the military's determination to the Physical Disability Board of Review (the "Board"), arguing that a VA examination finding him qualified for medical retirement was more probative of his disability at the time he was separated than the military's examination. The Board disagreed and upheld White's discharge.

White now challenges the Board's decision on the grounds that it violates the Administrative Procedure Act (the "APA"). Before the Court are the parties' cross-motions for summary judgment. For the reasons stated herein, White's motion for summary judgment will be granted, the defendants' motion will be denied, and the case will be remanded to the Board for further consideration consistent with this Memorandum Opinion.

## BACKGROUND

### I. STATUTORY AND REGULATORY FRAMEWORK

A soldier in the Army found unfit to serve because of a physical disability may be separated or retired, depending on the severity of his or her disability. 10 U.S.C. §§ 1201(a), 1203(a). Soldiers who are separated are entitled only to severance pay, while soldiers who are retired receive, *inter alia*, lifetime retired pay, healthcare, and commissary privileges. 10 U.S.C. § 1203(a) (providing severance pay for separated individuals); 10 U.S.C. § 1201(a) (providing retired pay for medically retired individuals); 32 C.F.R. § 199.17 (providing TRICARE healthcare for retired servicemembers); DODI § 1330.17, Enclosure 2, ¶ 3(c)(1) (stating that retired servicemembers "granted retirement pay for physical disability" "are authorized commissary privileges").

The Army uses a complex Disability Evaluation System to determine whether a soldier's disability warrants separation or retirement. *See* Army Reg. 635–40, ¶ 4–1. First, an Army medical examiner examines the soldier and determines whether he or she is qualified to perform his or her duties. *Id.* ¶ 4–10. If the medical examiner concludes that a soldier is not medically qualified, a Medical Evaluation Board ("MEB") is convened to review the medical examiner's determinations and make its own "conclusions and recommendations regarding fitness." *Id.* ¶ 4–7. If "the MEB finds that one or more of a Soldier's medical conditions . . . do not meet medical retention standards," the MEB recommends the case to a Physical Evaluation Board ("PEB"). Army Reg. 635–40, ¶ 4–12(f). The PEB reviews the MEB's findings; conducts its own, "more thorough investigation into the nature and permanency of the servicemember's condition," and ultimately assigns a disability rating to a soldier's condition that determines whether he or she

qualifies for disability retirement. *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 85–86 (D.D.C. 2014) (citing Army Reg. 635–40 ¶¶ 4-17, 19).

In determining a disability rating, the PEB is bound by the Veteran's Administration Schedule for Rating Disabilities (the "VASRD"), a set of regulations that instruct rating boards on evaluating the nature and degree of a soldier's disability. Army Reg. 635–40, ¶ 4–1(d)(1). The VASRD contains lists of codes associated with specific disabilities, and each code is accompanied by a disability rating or a range of ratings with instructions on determining which applies to a specific case. *See, e.g.*, 38 C.F.R. § 4.71a (the schedule of ratings for disabilities of the musculoskeletal system). In addition to these disability rating schedules, rating boards are required to consider other aspects of a soldier's disability. *See, e.g.*, 38 C.F.R. § 4.40 (functional loss is to be considered when evaluating a musculoskeletal disability). Any reasonable doubt that arises as to the rating of a disability must be resolved in favor of the soldier. 38 C.F.R. §§ 3.102, 4.3. When a board gives a soldier a disability rating of 30 percent or higher, that soldier is medically retired; when a soldier's disability rating falls below 30 percent, he or she is discharged with severance pay.[1] 10 U.S.C. §§ 1201(b)(3)(B), 1203(b)(4).

A soldier may appeal the PEB's determination to the Board.[2] 10 U.S.C. § 1554a. The Board was created in 2008, in part, in response to reports that the military consistently assigned disability ratings lower than those assigned by Veterans Affairs (the "VA"). *See Adams v. United States*, 117 Fed. Cl. 628, 665–70 (2014) (detailing the legislative history of the Dignified Treatment of Wounded Warriors Act of 2008, which established the Board). In reviewing a PEB

---

[1] Qualification for retirement also depends on the cause and timing of the disability and whether the disability may be permanent. *See* 10 U.S.C. §§ 1201(b)(3)(B), 1203(b)(2)–(3).
[2] The Board only considers appeals from soldiers discharged between September 11, 2001, and December 31, 2009, with a disability rating of 20 percent or less. 10 U.S.C. § 1554a(b). Other discharged soldiers have other avenues of appeal. *See* 10 U.S.C. § 1554; 32 C.F.R. § 581.1.

decision where there are competing disability ratings, the Board is required to give consideration to VA ratings. Specifically, the Board must compare military and VA disability ratings and consider any differences between the two, "particularly if the VA rating was awarded within 12 months of the former Service member's separation." DoDI 6040.44, Enclosure 3, ¶ 4(a)(5). And because the Board is bound by the VASRD, deference to VA ratings is, in some instances, required. DODI 6040.44, Enclosure 3, ¶ 3(e). For instance, when "there is a question as to which of two evaluations shall be applied," the Board is required to assign the higher rating "if the disability picture more nearly approximates the criteria required for that rating." 38 C.F.R. § 4.7. And, like the PEB, the Board must resolve any reasonable doubt in favor of the former servicemember. 38 C.F.R. §§ 3.102, 4.3.

Based on the evidence presented to it, the Board is authorized to recommend that an individual's discharge be recharacterized to retirement, increase a disability rating given by the PEB, or issue a new disability rating. 10 U.S.C. § 1554a(d). If the Board does not recommend one of these changes, the PEB's decision becomes final. 10 U.S.C. § 1554a(e)(3).

## II. FACTS

White began active duty service in the Army in 1994. After completing his physical fitness test in 1995, he began experiencing episodes of lower back pain. (Administrative Record ("AR") 6, 44.) Over time, his pain worsened, and in 2002, examinations, X-rays, and magnetic resonance imaging revealed "decreased disc space . . . compatible with mild degenerative disc disease," "degenerative spurring of the sacroiliac . . . consistent with osteoarthritis," and "broad disc bulges . . . with moderate to severe spinal canal stenosis." (AR 6; *see also* AR 578.) White underwent three back surgeries in 2002 and 2003 and continued treatment for his conditions with physical therapy. (AR 611.)

On March 27, 2003, the Army placed White on a three-month temporary profile for "lumbar degenerative disc disease," which prevented him from, *inter alia*, "running, jumping, stooping, crawling . . . , riding/driving tactical vehicles . . . [,] standing at attention longer than 5 minutes," or lifting more than 20 pounds. (AR 387.) It also limited his workdays to four hours per day and ordered that he not undergo any physical fitness tests. (*Id.*) On September 12, 2003, he was placed on permanent profile, which imposed many of the same limitations but increased his workday to six hours. (AR 47.)

An Army physician directed White to an MEB, and, on November 4, 2003, the MEB determined that White was unfit to return to duty and referred him to a PEB. (AR 46, 78–79.) As part of the PEB's investigation, White attended a physical therapy examination (the "PEB examination") on November 6, 2003, for range of motion measurements. (*See* AR 65–66.) The clinician determined that White's standing forward flexion was 45 degrees, his seated forward flexion was 30 degrees, his standing extension was 30 degrees, and his prone extension was 45 degrees. (AR 66.) Based on the results of this examination, on December 1, 2003, the PEB determined that White's disability prevented him from performing his duties and assigned a disability rating of 20 percent. (AR 35.) The PEB recommended that he be separated with severance pay. (*Id.*)

On January 5, 2004, White attended a medical examination through the VA (the "VA examination"). (AR 609.) The physician found that the range of motion in his thoracolumbar spine showed flexion of 30 degrees, extension of 10 degrees, lateral flexion of 10 degrees, and rotation of 10 degrees. (AR 612.) The range of motion of his cervical spine showed flexion of 45 degrees, extension of 45 degrees, lateral flexion of 45 degrees, and rotation of 80 degrees.

(*Id.*)  Based on the results of this examination and White's Army medical records, the VA awarded White a disability rating of 40 percent.  (AR 618.)

Based on the PEB's disability rating and recommendation, White was medically separated from the Army on March 27, 2004.  (AR 32.)  On April 24, 2011, White applied for review of the PEB's decision by the Board, and, on February 26, 2015, a majority of the Board recommended that the PEB's disability rating remain unchanged.  (AR 7, 30–31.)  In its decision, the Board summarized White's relevant medical history, including the origin of his injury, the surgeries he had undergone, and the treatment he had received.  (AR 6.)  It also referenced White's commander's statement, which "indicated that [White] was able to perform duties in-garrison as a unit mail clerk; however[,] he was not deployable due to his inability to perform his [military occupational specialty] duties as an Infantryman."  (*Id.*)  The Board next reviewed the PEB and the VA examinations.  (*Id.*)  The Board stated that the former, which was "approximately 5 months prior to separation," "contains documentation that [White] had marked and frequent [lower back pain] episodes, which precluded him from performing the majority of his activities of daily living, disrupted his sleep and required narcotics for pain control."  (*Id.*)  And it noted that the VA examination, which was "approximately 3 months prior to separation," similarly "documented chronic [lower back pain] that precluded him from most of his activities of daily living, such as limited [sic] to taking showers, an inability to wear socks, cutting toenails, tying his shoelaces and removing his shoes."  (*Id.*)  The Board summarized other evidence from the evaluations and ratings in two charts.  The first shows how White's disability was coded and rated by each rating board.  (*Id.*)  The second appeared as follows:

| Thoracolumbar ROM (Degrees) | PT 4-5 Mos. Pre-Sep.[3] | VA C&P 3 Mos. Pre-Sep.[4] |
|---|---|---|
| Flexion (90 Normal) | 45 | 30 |
| Combined (240) | - | 80 |
| Comment | ROM limited by poor effort; stiff during ROM; 2/5 positive Waddell signs | Back brace; Normal gait, strength/sensation & reflexes |
| § 4.71a Rating | 20% | 40% |

(AR 7.)

The Board then reached its conclusion in a single paragraph:

> The Board considered the probative value between the [PEB examination] (approximately 5 months prior to separation) and the [VA examination] (3 months prior to separation). Although both examinations contained detailed comments, the VA C&P exam contained complete ROM's [sic] measurements to include a combined ROM value. The Board noted that the [PEB examination] contained relevant comments related to [White]'s effort during the evaluation. Additionally, the Board noted [White] was performing mailroom duties satisfactorily as cited in the commander's statement. After a thorough discussion, a consensus of the Board members adjudged that the [PEB] examination was the most probative valued exam and more likely reflected [White]'s disability at the time of separation. The PEB appropriately utilized the forward flexion of 45 degrees documented on the [PEB] examination to arrive at its 20% evaluation. The Board did not find any evidence of an unfitting neurological abnormality. After due deliberation, considering all of the evidence and mindful of [38 C.F.R.] § 4.3 (reasonable doubt), the Board recommends no change in the PEB's adjudication of the [lower back pain], lumbar fusion without neurologic abnormality.

(AR 7.)

### III.  PROCEDURAL HISTORY

White initiated this action on December 6, 2018. His single-count complaint challenges the Board's decision as arbitrary and capricious in violation of the APA. (Compl. ¶¶ 42–46.) He

---

[3] The information in this column corresponds to the PEB examination.
[4] The information in this column corresponds to the VA examination.

moved for summary judgment on June 10, 2019, and defendants filed their cross-motion for summary judgment on July 11, 2019. In support of his motion, White argues that the Board's determination that the PEB examination was more probative than the VA examination was arbitrary and capricious because the Board failed to explain how it relied on the evidence it cited and how it reached its conclusion. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") at 10–16, ECF No. 18.) White also urges that the Board's conclusion is not supported by substantial evidence. (*Id.* at 12–13.) In their cross-motion, defendants contend that the Board sufficiently explained its use of the evidence and its conclusion, and that conclusion is supported by substantial evidence. (Defs.' Cross-Mot. for Summ. J. at 10–18, ECF No. 19-2.) Those motions are now ripe.

## ANALYSIS

### I. LEGAL STANDARDS

When reviewing agency action under the APA on cross-motions for summary judgment, courts do not apply the typical summary judgment standard contained in Federal Rule of Civil Procedure 56. *Stewart v. Stackley*, 251 F. Supp. 3d 138, 155 (D.D.C. 2017). Instead, the standard proscribed by the statute applies: A court must "hold unlawful and set aside agency action, findings, and conclusions" that are, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2). The scope of this review is "narrow," and "a court is not to substitute its judgment for that of the agency." *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (citations and internal quotation marks omitted); *see also Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013) (review under the APA is "highly deferential" (citation and internal quotation marks omitted)). Moreover, a court does not engage in fact finding and is instead bound by the administrative record that was before the agency. *CTS Corp.*

*v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("It is black-letter administrative law that in an Administrative Procedure Act case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." (citations, internal quotation marks, and alterations omitted)).

The APA's "arbitrary and capricious" test requires courts to "ensur[e] that agencies have engaged in reasoned decisionmaking." *Judulang*, 565 U.S. at 483–84. To this end, an agency must have reviewed the record and articulated an explanation for its action that establishes "a rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (citation and internal quotation marks omitted); *see also Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[T]he agency must explain why it decided to act as it did."). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation and internal quotation marks omitted) (emphasis in original). "This does not mean that an agency's decision must be a model of analytic precision to survive a challenge," so long as "the agency's path" between the facts found and decision made "may reasonably be discerned." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (citation and internal quotation marks omitted).

Similarly, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation and internal quotation marks omitted). In doing so, a court "must consider the whole record upon which an agency's factual findings are based, including whatever in the record fairly detracts from the evidence supporting the agency's decision." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C.

Cir. 2018) (citation and internal quotation marks omitted). "Evidence that is substantial viewed in isolation may become insubstantial when contradictory evidence is taken into account." *Id.* (citation and internal quotation marks omitted). Thus, an agency cannot ignore evidence contrary to its action or dismiss such evidence "without adequate explanation." *Id.*

## II. THE BOARD'S DECISION

The Board's single-paragraph analysis fails to explain how its conclusion is supported by the facts. The Board identified only two facts as support for its conclusion, but, without explanation, the importance of these facts is unclear. First, the Board "noted that the [PEB examination] contained relevant comments related to [White]'s effort during the evaluation." (AR 7.) Although the medical examiner conducting White's PEB examination perceived that his range of motion was "limited by [his] effort," the Board did not explain how this comment leads to the conclusion that the PEB examination is more probative of the degree of White's disability at the time of separation than the VA examination. (AR 66.) The Board also failed to account for other comments made by that medical examiner that may explain the examiner's perception of White's effort. Specifically, the PEB examiner noted that White "has run out of pain meds so his pain is a 7/10 today." (AR 65.) The Board made no mention of his experiencing pain during his PEB examination, even though it may have affected his effort while testing his range of motion. And, importantly, unlike effort, pain is explicitly listed by the VASRD as a consideration when determining the functional loss caused by a disability. *See* 38 C.F.R. § 4.40 ("The functional loss . . . may be due to pain," and "a part which becomes painful on use must be regarded as seriously disabled."). Thus, White's pain is not only relevant under the regulations, but its consideration is mandated by them. Nonetheless, the record gives no indication that pain was factored into the Board's analysis.

10

Second, in support of its conclusion, the Board "noted [White] was performing mailroom duties satisfactorily as cited in the commander's statement." (AR 7.) But neither the commander's statement nor the Board's decision elucidates exactly what White's mailroom duties were or how they are probative of the degree of his disability. His mailroom position may have involved minimal physical movement. Indeed, the commander's statement also reports that White was "unable to lift heavy weights over 20 pounds, a necessity in his field [as an Infantryman]." (AR 50.) Thus, the record does not reveal why the Board concluded that White's performance of mailroom duties favors its conclusion or why that conclusion is not undercut by his limited ability to perform activities of daily living.

Moreover, the Board's analysis does not show that it took account of contradictory evidence. *See Genuine Parts Co.*, 890 F.3d at 312 ("[A]n agency cannot ignore evidence that undercuts its judgment . . . ."). First, the Board stated that the VA examination occurred closer in time to White's separation than the PEB examination. (AR 7.) Second, it stated that, unlike the PEB examination, the VA examination "contained complete [range of motion] measurements to include a combined ROM value." (*Id.*) On their face, both facts appear to undercut the Board's conclusion. Because the VA examination took place closer to White's separation, why is it not more indicative of his disability at separation than the PEB examination? But because the Board failed to explain how it weighed this fact, if at all, the Court cannot discern if the Board's decision is the product of reasoned decisionmaking. And, as defendants admit, the thoroughness of an examination is an important "factor" to be considered "in comparing the examinations." (Defs.' Reply at 6, ECF No. 24.) The Board's failure to explain how thoroughness affected its analysis leaves the Court guessing as to whether it was actually considered.

Although acknowledging the Board's obligation to resolve any reasonable doubt in favor of the servicemember, as required by 38 C.F.R. § 4.3, the defendants refer only to the Board's statement that it was "mindful" of this regulation. (AR 7.) But a mere mention of the regulation is not enough; it provides no insight as to whether the Board concluded that the regulation was applicable or, if applicable, why it did not help to resolve the conflicting evidence.

Absent explanation of the evidence cited in the Board's analysis, the Court cannot discern the "path" the Board took to reach its conclusion. The Board's decision, therefore, does not "permit this Court to exercise its function of judicial review" and is arbitrary and capricious. *CS-360 v. Dep't of Veterans Affairs*, 846 F. Supp. 2d 171, 189 (D.D.C. 2012).[5]

Moreover, based on review of the entire administrative record, the Court is unable to determine if the Board's conclusion is supported by substantial evidence. As noted above, the Board failed to consider White's pain as required by 38 C.F.R. § 4.40, and the commander's statement, which the Board credited, contains evidence that is relevant, but it appears to undercut the Board's ultimate conclusion. In addition, both the PEB and VA examination indicate that White's activities of daily living were extremely limited by his disability. Both examiners noted that White was unable to sit in the bathtub, experienced extreme difficulty with putting on his socks and shoes, and had difficulty sleeping because of his back pain. (AR 65, 611–12.) The PEB examiner also noted that White "can't run, can't play with his kids, can't play basketball,

---

[5] In his motion for summary judgment, White also argues that the Board failed to properly apply three legal provisions: DODI 6040.44, Enclosure 3, ¶ 4(a)(5), which requires the Board to give special consideration to VA rating determinations awarded within 12 months of the veteran's separation; 38 C.F.R. § 3.102, which, in conjunction with 38 C.F.R. § 4.3, requires the Board to resolve any reasonable doubt that arises in favor of the veteran; and 38 C.F.R. § 4.7, which requires the Board to assign the higher rating when "there is a question as to which of two evaluations shall be applied" and "if the disability picture more nearly approximates the criteria required for that rating." (Pl.'s Mot. at 16–24.) On remand, the Board should consider their applicability and explain how, if at all, they impact its analysis.

etc." (AR 65.) Although the VASRD requires that the Board consider a soldier's "inability . . . to perform the normal working movements of the body," the Board failed to mention, let alone consider, these limitations in its analysis. 38 C.F.R. § 4.40. Because the Board ignored this seemingly significant evidence that conflicted with its conclusion, the Court cannot conclude that the Board's decision is supported by substantial evidence. *See Genuine Parts Co.*, 890 F.3d at 312 ("Evidence that is substantial viewed in isolation may become insubstantial when contradictory evidence is taken into account.").

## CONCLUSION

For the reasons stated above, the Court will grant White's motion for summary judgment, deny defendants' motion for summary judgment, and remand to the Board for further proceedings consistent with this Memorandum Opinion. In doing so, the Court does not decide whether the Board's ultimate conclusion was correct or incorrect. Here, the Court only determines that the Board's decisionmaking process was flawed. On remand, the Board should review the administrative record and explain its decision in a way that clearly connects the facts found to the decision made. In doing so, the Board should consider all relevant VASRD provisions and DOD Instructions and explain how, if at all, they are applicable.

ELLEN S. HUVELLE  
United States District Judge

Date: December 11, 2019